Charles F. BLUMENSTOCK, Jr., and
Anita Henkel Blumenstock,
Appellants,

v.

John G. GIBSON and Annette H. Gib-
son, Husband and Wife, Jonathan
Forrester, and Prudential–Berger,
Charles & Associates Real Estate,
Inc., Appellees.

Superior Court of Pennsylvania.

Argued June 18, 2002.

Filed Oct. 31, 2002.

Reargument Denied Jan. 3, 2003.

Charles F. Blumenstock, Lancaster, for appellants.

Paul F. Lantieri, Lancaster, for Gibson, appellee.

Christopher S. Underhill, Lancaster, for Forrester, appellee.

BEFORE: DEL SOLE, P.J., HUDOCK and BROSKY, JJ.

OPINION BY HUDOCK, J.:

¶ 1 This is an appeal from an order granting summary judgment in favor of all Appellees and against both Appellants as to all claims. We affirm.

¶ 2 On April 8, 1997, Appellants Charles F. Blumenstock, Jr., and his wife, Anita (Buyers), entered into a written agreement of sale to purchase a house at 244 S. Homestead Drive, Landisville, Pennsylvania, from John and Annette Gibson (Sellers). Buyers were represented in this matter by their agent, C.F. "Red" Blumenstock, a licensed real estate broker and appraiser, and the father of Charles F. Blumenstock, Jr. Buyers' Brief at 7. The property was listed for sale by Jonathan Forrester (Forrester), an independent contractor associated with Prudential–Berger, Charles & Associates Real Estate, Inc. (Prudential–Berger). (Collectively, Sellers, Forrester and Prudential–Berger are termed Appellees; Forrester and Prudential–Berger are designated as Realtors.)

¶ 3 Sellers executed a disclosure statement, which was made a part of the agreement of sale pursuant to an addendum. The agreement of sale also included a property inspection contingency clause, which Buyers exercised. On April 25, 1997, a property inspection was performed by a representative of The Property Examiners, Inc. (Property Examiners), a professional inspection firm. Property Examiners prepared a written report.

¶ 4 Prior to closing, Buyers allegedly indicated their concern over the fact that the property had two sump pumps.[1] They aver that their agent orally requested information concerning the sump pumps from Forrester. See Complaint, 5/29/98, at 2–3 ¶¶ 15–20. Buyers assert that Forrester stated that the duplicative sump pumps were installed "as a precaution" when the basement was improved. Buyers' Brief at 8. Buyers allege they understood this to mean the sump pumps were unnecessary and never ran. Id. Buyers also aver they decided to purchase the property after concluding there was no "water problem." Buyers allege they relied in part on the purported oral information conveyed by Forrester on behalf of Sellers, and also on the written disclosure statement signed by Sellers. Buyers assert they would not have purchased the property had they been informed the sump pumps actually functioned from time to time. Furthermore, they conclude the very fact the sump pumps were installed and were needed indicates that a *per se* "water problem" existed on the property.

¶ 5 The real estate transaction closed on June 20, 1997, at which time Buyers paid $176,000.00 for the property. After Buyers moved into the new home, they realized the sump pumps did, in fact, run, sometimes intermittently, and sometimes constantly if heavy rains occurred. Buyers aver that on March 25, 1998, a circuit breaker controlling the sump pumps shut off, and the pumps did not run for several hours. (Buyers do not contend that the electric service to their home was interrupted, but only that the circuit breaker controlling the sump pumps shut off for an unexplained reason.) By the time the circuit breaker problem was discovered, the basement of the house allegedly was covered by several inches of water and many

---

1. A "sump" is a pit or well constructed to collect liquids such as oil or water. A "sump pump" is a pump set to drain a sump. Webster's New Universal Unabridged Dictionary at 1825 (2d ed.1983).

items of personal property had been damaged. *See* Complaint, 5/29/98, at 4–6 ¶¶ 32–35, 48.

¶ 6 Buyers filed a complaint on May 29, 1998, seeking rescission of their purchase and alleging breach of contract, fraud and fraud-based violations of the Unfair Trade Practices and Consumer Protection Law (UTPCPL) and the Real Estate Seller Disclosure Act (RESDA) by the Sellers.[2] They also sought damages against Realtors for fraud, misrepresentation, negligent misrepresentation, and for fraud-based violations of UTPCPL and RESDA. The matter proceeded through discovery, with various filings by all parties. Sellers and Realtors filed separate motions for summary judgment, which the trial court granted on September 5, 2001. Buyers' timely notice of appeal followed on September 21, 2001.

¶ 7 The trial court did not require Buyers to file a concise statement, and none was filed. Buyers raise four issues: (1) whether the trial court erred in failing to apply the proper legal standard and the proper standard for evaluating a motion for summary judgment, and also in failing to understand certain pertinent facts of the case; (2) whether the real estate broker and the listing agent may avail themselves of the exculpatory clause in the agreement of sale when they were not parties to the agreement; (3) whether Buyers' claims remain actionable despite clauses for release, property inspection and integration in the sales agreement when Sellers and Realtors fraudulently induced Buyers to enter into a sales agreement; and (4) whether Sellers may seek summary judgment predicated on the release and integration clauses of the sale agreement when they did not raise this issue via new matter. *See* Buyers' Brief at 3 (issues paraphrased for clarity).

We shall address these claims *seriatim,* noting at the outset that we are not limited by the trial court's rationale and that we may affirm on any basis. *Thomas Rigging & Construction Company, Inc. v. Contraves, Inc.,* 798 A.2d 753, 758 (Pa.Super.2002) (citing *Shearer v. Naftzinger,* 560 Pa. 634, 638, 747 A.2d 859, 861 (2000)).

¶ 8 Our review of the trial court's grant of summary judgment is plenary. *Philadelphia Ambulatory Care Center, Inc. v. Rite Aid Corporation,* 805 A.2d 613 (Pa.Super.2002).

> Summary judgment is proper where the pleadings, depositions, answers to interrogatories, admissions and affidavits and other materials demonstrate that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. We apply the same standard of review as the trial court in that we view the record in the light most favorable to the party opposing the motion and resolve all doubts as to the existence of a genuine issue of material fact in favor of the nonmoving party. We will reverse the trial court's grant of summary judgment only upon an abuse of discretion or error of law.

*Id.* (quoting *Curry v. Huron Insurance Co.,* 781 A.2d 1255, 1257 (Pa.Super.2001)).

¶ 9 We first address the question of whether the trial judge applied the correct standard for summary judgment. We conclude that he did. The trial court opinion sets forth the relevant rule of civil procedure, along with pertinent case law construing that rule. Trial Court Opinion, 9/5/01, at 4–5. The subsequent factual and legal discussion of the points at issue in the case demonstrates that the trial judge

**2.** Respectively, 73 Pa.C.S.A. § 201–1 to 201–9.3 and 68 P.S. § 1021–1036 (repealed December 20, 2000, effective December 20, 2001).

actually applied this standard in ascertaining that summary judgment was proper.

¶ 10 The next question to be resolved is whether the trial court employed the proper legal standards in determining that Buyers were unable to establish a *prima facie* case under any of their theories of recovery. The fundamental ground for all of Buyers' claims is that they were the victims of alleged fraudulent misrepresentations by Sellers and Forrester. In real estate transactions, fraud arises when a seller knowingly makes a misrepresentation, undertakes a concealment calculated to deceive, or commits non-privileged failure to disclose. *Sewak v. Lockhart,* 699 A.2d 755, 759 (Pa.Super.1997). "Fraud is a generic term used to describe anything calculated to deceive, whether by single act or combination, or by suppression of truth, or suggestion of what is false, whether it be by direct falsehood or by innuendo, by speech or silence, word of mouth, or look or gesture." *Id.* (quotation omitted).

¶ 11 To prove fraud, a plaintiff must demonstrate by clear and convincing evidence:

(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance.

*Id.* (quoting *Gibbs v. Ernst,* 538 Pa. 193, 207, 647 A.2d 882, 889 (1994)). Unsupported assertions and conclusory accusations cannot create genuine issues of material fact as to the existence of fraud. *Gruenwald v. Advanced Computer Applications, Inc.,* 730 A.2d 1004, 1014 (Pa.Super.1999). Buyers have not explicitly addressed the six elements that must be proven under the above standard. However, we shall assume, purely for the sake of argument, that they have demonstrated all elements other than justifiable reliance. Establishing this element is necessary to finding that fraud exists. Furthermore, as discussed below, Buyers must establish justifiable reliance before they may introduce evidence that falls outside the confines of the written agreement of sale underlying this appeal.

¶ 12 According to Buyers, the alleged fraudulent misrepresentations asserted in the present case led them to enter into a written agreement with Sellers for the purchase of real estate. In this case, the agreement of sale includes an integration clause which provides as follows:

(A) Buyer understands that any representations, claims, advertising, promotional activities, brochures or plans of any kind made by Seller, Agents or their employees are not a part of this Agreement, unless expressly incorporated or stated in this Agreement.

(B) It is understood that Buyer has inspected the Property (including fixtures and any personal property specifically scheduled herein), or hereby waives the right to do so, and has agreed to purchase it in its present condition. Buyer acknowledges that the Agents have not made any independent examination or determination of the structural soundness of the Property, the age or condition of the components, environmental conditions, the permitted uses, or of conditions existing in the locale where the Property is situated; nor have they made a mechanical inspection of any of the systems contained therein.

(C) It is further understood that this Agreement contains the whole

agreement between Seller and Buyer and there are no other terms, obligations, covenants, representations, statements or conditions, oral or otherwise of any kind whatsoever concerning this sale. Furthermore, this Agreement shall not be altered, amended, changed, or modified except in writing executed by the parties.

Agreement of Sale, 4/8/97, ¶ 15 (Representations).

¶ 13 The Agreement of Sale explicitly incorporates three addenda labeled "A," "B," and "C." *Id.,* ¶ 5 (Special Clauses). Addendum "A" includes several contingency clauses covering, *inter alia,* the sale of Buyers' previous home, the establishment of a sales commission cap, and the necessity of a satisfactory appraisal report on Sellers' property. Addendum "B" comprises the mortgage contingency agreement, and Addendum "C" is the Seller's Disclosure Statement. Paragraph 13 of Addendum "B" contains a specific release clause as follows:

Buyer hereby releases, quit claims and forever discharges Seller, All Agents, their Subagents, Employees and any Officer or Partner of any one of them and any other Person, Firm, or Corporation who may be liable by or through them, from any and all claims, losses or demands including, but not limited to, personal injuries and property damage and all of the consequences thereof, whether now known or not, which may arise from the presence of termites or other wood boring insects, radon, lead-based paint hazards, environmental hazards, any defects in the on-site sewage disposal system or deficiencies in the on-site water service system, **or any defects or conditions on the Property.** This release shall survive settlement.

Agreement of Sale, 4/8/97, Addendum "B" at ¶ 13 (emphasis added). Addendum "C" contains an averment by Sellers that the property had a sump pump, that there was no "water leakage, accumulation, or dampness within the basement or crawl space" as of February 9, 1997 (the date on which Sellers' Disclosure Statement was signed.) *Id.,* Addendum "C", at 1. The disclosure form also contains the following question: "Do you know of any repairs or other attempts to control any water or dampness problem in the basement or crawl space?" Sellers answered "no." It is thus clear that the Sellers' Disclosure Statement itself contains two obviously contradictory averments, *i.e.,* that the property has a sump pump but that there have been no attempts to control a "water or dampness problem."

¶ 14 We note that Sellers' Disclosure Statement explicitly provides that the averments in the Statement are "not a warranty of any kind" by Sellers or by their agent (Forrester, the listing real estate broker). *Id.,* Addendum "C" at 1. Furthermore, the disclosure statement is limited in scope to disclosing "material defects." *Id.* The Statement defines "material defect" as "a problem with the property or any portion of it that would have a significant adverse impact on the value of the residential real property or that involves an unreasonable risk to people on the land." *Id.*

¶ 15 Where the parties to an agreement adopt a writing as the final and complete expression of their agreement, alleged prior or contemporaneous oral representations or agreements concerning subjects that are specifically covered by the written contract are merged in or superseded by that contract. *Brinich v. Jencka,* 757 A.2d 388, 400 (Pa.Super.2000), *appeal denied,* 565 Pa. 634, 771 A.2d 1276 (2001). When parties, without any fraud

or mistake, have deliberately put their engagements in writing, the law declares the writing to be not only the best, but the only evidence of their agreement. *Lenihan v. Howe*, 449 Pa.Super. 426, 674 A.2d 273, 275 (1996). "[U]nless fraud, accident or mistake be averred, the writing constitutes the agreement between the parties, and its terms cannot be added to nor subtracted from by parol evidence." *Id.* (quoting *Union Storage Co. v. Speck*, 194 Pa. 126, 133, 45 A. 48, 49 (1899)).

¶ 16 The general rule is that where the alleged oral representations concern a subject which is specifically addressed in the written contract, and the written contract covers or purports to cover the entire agreement of the parties, mere allegations of falsity or fraud will not make parol evidence admissible. *Bardwell v. Willis Co.*, 375 Pa. 503, 506–07, 100 A.2d 102, 104 (1953) (cited with approval, *HCB Contractors v. Liberty Place Hotel Associates*, 539 Pa. 395, 398, 652 A.2d 1278, 1279 (1995)). *Bardwell* has been interpreted to mean that parol evidence of representations is inadmissible as to a matter covered by a written agreement with an integration clause unless the parties agreed that those representations would be added to the written agreement but they were omitted because of fraud, accident or mistake. *1726 Cherry Street Partnership v. Bell Atlantic Properties, Inc.*, 439 Pa.Super. 141, 653 A.2d 663, 666 (1995). This situation is commonly referred to as "fraud in the execution" since the party proffering the evidence contends that he executed the agreement because he was defrauded by being led to believe that the document contained terms that actually were omitted therefrom. *Id.*

¶ 17 "Fraud in the execution" must be distinguished from a case of "fraud in the inducement." In the latter type of case, the party proffering evidence of additional prior representations does not contend that the representations were omitted from the written agreement, but, rather, claims that the representations were fraudulently made and that "but for them" he would never have entered into the agreement. *1726 Cherry Street Partnership*, 653 A.2d at 666. The present matter must be deemed to implicate "fraud in the inducement" since Buyers aver they would not have purchased the property had they known the sump pumps actually functioned because they consider the need for the pumps to constitute a *per se* "water problem."

¶ 18 Pennsylvania case law makes a distinction between barring parol evidence to vary the terms of the agreement and admitting parol evidence to prove fraud in the inducement. *Id.* at 668 n. 2. In the latter case, the theory holds that since fraud induced the agreement, no valid agreement came into being and parol evidence is admissible to show that the alleged agreement is void. *Id.* Nevertheless, the case law clearly holds that a party cannot justifiably rely upon prior oral representations yet sign a contract denying the existence of those representations. *Id.* at 669. An exception to this general formulation of the impact of the parol evidence rule has been created and followed by the so-called "real estate inspection cases," *i.e.*, *LeDonne v. Kessler*, 256 Pa.Super. 280, 389 A.2d 1123 (1978), and its progeny.

¶ 19 The *LeDonne* line of cases involves written agreements for the sale of real property, almost always residential, that contain integration clauses. *1726 Cherry Street Partnership*, 653 A.2d at 669 n. 6. Despite these integration clauses, Pennsylvania courts sometimes have permitted evidence of oral representations to be admitted. *Id.*

The test enunciated for this type of case, as stated by the *LeDonne* court, requires a balancing of the extent of the parties' knowledge of objectionable conditions derived from a reasonable inspection against the extent of the coverage of the contract's integration clause in order to determine whether that party could justifiably rely upon oral representations without insisting upon further contractual protection or the deletion of an overly broad integration clause.

*1726 Cherry Street Partnership*, 653 A.2d at 669–70 n. 6. *Accord Lenihan v. Howe*, 449 Pa.Super. 426, 674 A.2d 273, 275 (1996) (applying the *LeDonne* balancing test in reliance upon the formulation set forth in *Myers v. McHenry*, 398 Pa.Super. 100, 580 A.2d 860, 864 (1990)). The *LeDonne* test was crafted because Pennsylvania courts have refused to enforce the parol evidence rule in so strict a manner as to deny relief to a party who was unable to entirely protect himself from the harm he eventually suffered. *1726 Cherry Street Partnership*, 653 A.2d at 670 n. 6.

¶ 20 Buyers contend the trial court neglected to perform the necessary *LeDonne* balancing test to ascertain whether a reasonable inspection of the property would have placed them on notice concerning the objectionable condition (the alleged "water problem"). We cannot agree that the trial court failed in its duty. The trial judge did not explicitly rely on *LeDonne* nor did he provide a detailed analysis of the elements of fraud. However, the trial judge specifically addressed the question of whether Buyers demonstrated justifiable reliance. Trial Court Opinion, 9/5/01, at 7–9. The trial judge considered the nature of the purported oral communications, the scope of the integration clause in the agreement of sale, and the express release contained in Addendum "B" to that agreement. *Id.* As noted by the trial court, the crux of the difficulty is that Buyers obviously saw the sump pits and the sump pumps, but never asked whether the pumps ever functioned. *Id.* at 9. Instead, Buyers made the assumption that the pumps were not operational and were unnecessary. *Id.*

¶ 21 The trial court concluded that Sellers and Forrester were not required to affirmatively aver that the sump pumps were functional mechanical devices installed to protect the house from accumulating water in the basement sump pits. Thus, the trial court found Buyers' claim insufficient to overcome the combined effect of Buyers' opportunity to observe the physical condition of the property and make reasonable inferences from the facts that sump pits had been created and that fully operational sump pumps were installed. (Buyers do not claim that the pumps were broken when they inspected the premises. They merely state that weather conditions did not require the pumps to operate.) The trial court weighed the obviousness of the sump pits and sump pumps along with the terms of the integration and release clauses. The trial court held that under the clear language of the Agreement of Sale which Buyers prepared, they expressly disclaimed the existence of any of the representations which they now argue induced them to purchase the property. Trial Court Opinion, 9/5/01, at 8. We agree with the trial court's analysis.

¶ 22 Buyers do not argue that Sellers hid the existence of the sump pits or the sump pumps, nor do they claim that they could not see the pits or the pumps. Rather, they contend that, by definition, any home with an operational sump pump has a "water problem." However, the trial court rejected this claim because the entire purpose of a residential sump pump is to remove water from basement sumps so that the pits do not overflow. Trial Court

Opinion, 9/5/01, at 6. The trial court also rejected Buyers' interpretation of the information in the Sellers' Disclosure Statement on the grounds that Buyers are competent adults who should have been able to infer from the existence of the sump pumps that these devices might run from time to time. *Id.* at 6. Furthermore, the only evidence Buyers have presented, even viewed in the light most favorable to their cause, indicates that there was no water accumulation in the basement as long as the sump pumps were supplied with electricity and were kept in proper operating order. *Id.* at 3–4, 6.

¶ 23 In light of all the above circumstances, the trial court concluded that a reasonable inspection of the property by Buyers and Property Examiners provided the information needed to ascertain the existence of the "objectionable condition," *i.e.,* that the sump pumps were necessary to drain the sump pits and that without the two pumps, the pits would overflow with water. As such, evidence of the alleged oral representations by Sellers and Forrester must be deemed impermissible. The trial court noted that Buyers are attorneys and are bound by the terms of the integration and release clauses which they signed.

¶ 24 We note that Buyers do not contend that they did not understand the meaning of the integration and release clauses in the agreement of sale they proffered to Sellers. Nor do they claim they attempted to negotiate alterations to these contract provisions. Furthermore, Buyers do not argue that Sellers hid the existence of the sump pits or the sump pumps, nor do they claim that they could not see the pits or the pumps. Rather, they aver that they were induced to purchase the property because they were told that the pumps were precautionary and that they, therefore, made an assumption that the pumps

were unnecessary. Under all these circumstances, we agree with the trial court that Buyers failed to demonstrate "justifiable reliance."

¶ 25 It is not enough simply to assert that a statement was "fraudulent" and that reliance upon it induced some action. *Gruenwald,* 730 A.2d at 1014. Nor is it sufficient to aver that a knowingly false statement was made for the purpose of misleading another into reliance upon it. *Sewak,* 699 A.2d at 759. Before fraud will be found, a plaintiff must demonstrate that he justifiably relied on the false statement. *Id.* Without a showing that it was justifiable for Buyers to rely on the statements (oral and written) by Sellers and their agent, Buyers cannot prove fraud. We agree with the trial court that Buyers did not demonstrate that their reliance was "justifiable." Thus, we find that the trial court properly ruled that Buyers may not move beyond the terms of the integrated agreement of sale to explore purported oral representations. In short, the *LeDonne* balancing test tips in favor of Appellees and not in favor of Buyers.

¶ 26 Buyers next contend that it was error for the trial court to permit Realtors to avail themselves of exculpatory provisions in the agreement of sale on the grounds that Realtors were not parties to the agreement and gave no consideration to Buyers. The law of Pennsylvania presently holds that a seller's agent may enforce the integration clause and any other exculpatory provision in the written agreement between a seller and a buyer. *Bowman v. Meadow Ridge, Inc.,* 419 Pa.Super. 511, 615 A.2d 755, 758 (1992). We are cognizant of Buyers' argument that *Bowman* was wrongly decided and that the courts of the State of New York have adopted a position more favorable to real estate buyers than that espoused by the courts of Pennsylvania. We note that the

*Bowman* court was aware of the New York precedent, but did not find its reasoning persuasive. *Id.* at 758, n. 2. We must follow the decisional law established by our own Court. Unless or until *Bowman* is overturned by an *en banc* panel of this Court, or by a decision of the Pennsylvania Supreme Court, it continues to be viable precedent for this Court and for the courts of common pleas. Thus, the trial court was correct in permitting Realtors to assert the exculpatory provisions in the written agreement between Buyers and Sellers.

¶ 27 Buyers' next argument is that allegations of fraud in the inducement suffice to overcome the provisions of an integration clause in a written contract. We have already considered this claim in the context of addressing Buyers' first issue. Under the circumstances presented by this particular case, we conclude that Buyers' claim of fraud in the inducement is insufficient to afford any basis for relief.

 ¶ 28 Buyers complain that Sellers and Realtors waived the defense of the integration and release clauses by failing to plead their existence as new matter in their answer and by waiting until discovery was completed before raising the clauses in their motion for summary judgment. It is true that under Pennsylvania Rule of Civil Procedure 1030, release is an affirmative defense that ordinarily must be pled as new matter. *Holmes v. Lankenau Hospital*, 426 Pa.Super. 452, 627 A.2d 763, 765 (1993). Under the Rule, if release is not pled as new matter, the right to assert the defense has been waived. *Id.* Nevertheless, our Rules of Civil Procedure must be liberally construed so that actions are resolved in a just, speedy and inexpensive manner consistent with Rule 126. *Id.* at 765–66.

The rules shall be liberally construed to secure the just, speedy and inexpensive determination of every action or proceeding to which they are applicable. The court at every stage of any such action or proceeding may disregard any error or defect of procedure which does not affect the substantial rights of the parties.

Pa.R.C.P. 126. Where the rights of the plaintiff have not been prejudiced through the defendant's failure to plead the defense of release prior to filing a motion for summary judgment, the trial court is not required to strictly enforce Rule 1030. *Holmes,* 627 A.2d at 766.

¶ 29 In this case, Buyers did not lack notice of the defense asserted. Both the integration and release clauses were part of the agreement of sale Buyers signed. Buyers themselves proffered the agreement of sale and its three addenda as substantive evidence in support of their own claims. The trial court was entitled to consider the entirety of the contract and all its terms when reaching a decision in this case. Indeed, the trial court was required to consider the entire contract because courts are not permitted to assume that a contract's language was chosen carelessly or that the parties were ignorant of the meaning of the language they utilized. *Seven Springs Farm, Inc. v. Croker,* 569 Pa. 202, 207–08, 801 A.2d 1212, 1215 (2002).

 ¶ 30 Buyers do not claim they failed to read the terms of the agreement of sale, nor do they contend that they did not understand the meaning of the release and the integration clauses. Rather, they challenge the fact that Appellees did not file an answer raising the affirmative defense of release. Procedural rules are not ends in themselves, and they are not to be exalted to the status of substantive objectives. *Holmes,* 627 A.2d at 766. Given the absence of prejudice or surprise to Buyers, we find that the trial court acted properly

in granting summary judgment notwithstanding Appellees' failure to argue release as an affirmative defense. Under conditions such as these, this Court will treat a grant of summary judgment as the equivalent of permitting a defendant to amend the pleadings to include the affirmative defense. *Holmes*, 627 A.2d at 766. We find no grounds to reverse the grant of summary judgment on the basis of this argument.

¶ 31 In light of the above, we conclude that Buyers did not establish all of the elements necessary for a *prima facie* showing of "fraud" as Pennsylvania law defines that term in the real estate context. Indeed, apart from asserting that Sellers and Forrester knowingly misstated the physical condition of the property, Buyers have provided no discussion concerning the legal elements of "fraud" nor have Buyers addressed the question as to whether the need for sump pumps can be deemed a "material defect" as that term is defined in the Sellers' written Disclosure Statement incorporated as part of the agreement of sale. *See supra* at 1035 (discussing Sellers' Disclosure Statement). Conclusory accusations cannot create genuine issues of material fact as to whether "fraud" exists. *Gruenwald*, 730 A.2d at 1014. Because all of Buyers' causes of action implicate allegations of fraud, we cannot find that the trial court erred in granting summary judgment to Appellees. We therefore affirm the ruling of the trial court.

¶ 32 Order affirmed.

¶ 33 DEL SOLE, P.J. files a Concurring Statement.

DEL SOLE, P.J., Concurring.

¶ 1 I join the majority. I write separately only to suggest that, since the underlying agreement which forms the basis of Appellants' claim contained the "re-lease" clause, Appellees should not be required to plead the release as new matter.

¶ 2 As the majority states, the trial court was "required to consider the entire contract." Op. at p. 1039.